Good morning, your honors. Assistant State's Attorney Farina Magani-Wakely representing the people of the state of Illinois. I'm Michael Deutsch and I'm representing the appellate. Okay. And counsel, how long do you want to reserve for? I'll reserve five minutes. Okay. And we have read the briefs, but this case is really fact-specific. So the facts that support your extrinsic fraud, compensatory bias, please state those, the reasons why you think this is actual or the standard is the actual prejudice versus probability of bias. And what was my other issue that I wanted you to address? I'll think of it when you... I'll cover it. I'll cover it. Yes. And I have one question to you in a while, Sophie, to the state. When was that photograph taken with all of the policemen standing behind? Good question. It was during the time that Mr. Carrasquillo was gone. This case was before the en banc, but I cannot give you the actual date of that photograph as I stand here. Okay. That was... It's a common practice in my experience that the FOP buses police officers to the en banc hearing when there is an issue involving a police officer. I fully understand that. I just don't understand how they were standing behind. Yeah, it looks... The board, and that is why I wanted to know. Yeah. When it was. Yeah. And maybe if the state has an answer, you can tell me that. All right. You can proceed. Just this last October, the opponent, Ronnie Carrasquillo, began his 44th year in prison for an impulsive, reckless act that he committed at the age of 18. He had a bench trial before Judge Frank Wilson, who turned out to be a corrupt judge, with a courtroom full of uniformed police officers. And as a result, he was convicted of first-degree murder, and he received a draconian sentence of 200 to 600 years. And in doing so, the judge did not consider in any real way his age, the fact that he had no prior criminal convictions, or his potential for rehabilitation or to restore to citizenship. He just basically said, I read the pre-sentence report, and I know the facts of the case, and you're getting 200 to 600 years. Unbeknownst to Mr. Carrasquillo or his lawyer at the time, Judge Wilson had taken a $10,000 bribe in a case several months earlier, in the case of Harry Alleman, who was accused of being a mafia hitman. Where's the nexus with regards to the Alleman case and this case? Okay, here's the nexus, as I see it. Wilson, after he took the bribe, he said to the lawyer who bribed him, who testified under oath, he told him, my life is destroyed, I'll lose my job, I cannot keep my pension, and he was beside himself. He was totally freaked out about what had happened. And this was a high-profile case. The next high-profile case that comes along is young Ronnie Carrasquillo, 18 years old, who's accused of killing a police officer. As a result of what happened in the Alleman case, there was a firestorm of negative publicity towards Judge Wilson. Two legislators called for a judicial inquiry board. One legislator called him a craven jurist. The state's attorney said what he did was outrageous and had his own press conference after Judge Wilson had a press conference, which was unheard of, a judge having a press conference about a ruling. And in response, the state's attorney said that this was outrageous. The newspapers, it was filled with the newspapers, editorials saying there should be an investigation. But this is all with regards to the acquittal of the Alleman case? Yes, but here's the state of mind. We're talking about you don't usually get the judge's state of mind after he is involved in corruption. So here's his state of mind. He's beside himself. He's going to lose his job. And here comes another case, a high-profile case, right after that, within months. And this is the nexus. The nexus is that basically he was his state of mind was to cover up what he did. They were still investigating him to cover it up, to rehabilitate himself, and to protect his job. And that's the nexus. This is a unique case because you don't have a judge who's taken a bribe's state of mind about how he felt about it. And it wasn't that Judge Wilson, as far as we know, did this often. This is one of the first times he took the bribe, and that's why he was so upset and worried about his job and his reputation. And now he's got a kid who's taken a bench trial in front of him with a courtroom full of uniformed police officers. And we believe that that is a nexus sufficient. And you're not going to find another case that has a nexus like that. What is the evidence about the state of mind? The state of mind is based on the testimony of the man who bribed him, who testified in two trials, two Al-Aman trials. The Al-Aman was acquitted as a result of the corruption. And then they brought a case saying that it wasn't a real jeopardy, didn't really attach because the judge was bribed. So they had a hearing and then a trial. And in both the hearing and the trial, Robert Cooley, who was the FBI informant who had actually bribed Judge Wilson, testified as to what Wilson's state of mind was at that time, how upset he was and worried he was. And basically he was freaked out. And he said, my life has been destroyed. But just so the record's clear, there's no alleged bribe having taken place in this case. No, it's not about a bribe. It's about a compensatory bias. That's what this case is about. It's about the judge needing to rehabilitate his reputation, to cover up what he did, and to protect his job and his security. And that's the nexus that we have here. So basically we have two issues that we're appealing from, from the lower court. One is this 1401 issue of avoid conviction and sentence, which is a result of basically structural, extrinsic fraud. If the fact that judicial fraud is committed, it's not about what he did in the case specifically. It's about what he did before the case began. He only had colorful jurisdiction because he was corrupt, and there was a structural problem with the whole case because he was a biased judge. And as a result of that, 1401 allows you to bring a case without any time limitation if you can show that there was extrinsic fraud in the conviction and the sentence. And I would point out to the court the Illinois Supreme Court case of People v. Lawton, which is a very important case. It's L-A-W-T-O-N, Lawton. And in that case, they said... Was that in the briefs? Yeah. Yeah. When we talk about 1401, it's right in the beginning of the brief. Because what they said is that the purpose of 1401 is to achieve justice, and that the highest obligation of the court is to pursue justice. And I can't think of a case more clear of an injustice to this young man. He didn't have a fair trial because the judge had made up his mind what he was going to be doing before the trial because he wanted to protect his reputation and protect his job. And the cases all say that a biased judge is a structural defect. So you don't have to actually show specific, oh, he would have been convicted or he wouldn't have been convicted or he had a decent sentence. It's saying from the beginning you don't have a fair trial if you have a biased judge. And in this instance, with this particular judge, there never was a judicial inquiry board. No, they never did it judicially. They called for it and led two legislators, promoted it, but they never did. But when he was – when this case was pending, it was still – that could still be a possibility. It wasn't like they exonerated him or said, oh, no, we're not going to have a judicial inquiry. It just wasn't pursued at that particular point. But it was still looming in his mind, not to say about an investigation by the FBI, which ultimately happened later on. And, of course, you know that when he finally was found out, he committed suicide. That's how his state of mind was, that he would do anything not to be brought in and shown to have been taken that judicial bribe. So getting back to you, Justice Judge, it is a probability of bias case. And I say this because he had a personal interest in the outcome. He needed to save his job, save his reputation, be able to continue to be a judge, and that was a personal interest. It was not something other than his own interest to protect himself. And that's why it's a probability of bias. And, in fact, I think there was also actual bias as well. But I think probability of bias is what you do when you have a structural defect in a case. What is the indication of actual bias? Well, I think that a fair judge, not a judge that wasn't corrupt, could have easily found that this was a manslaughter case and not a murder case. It was a close case either way. The shots were fired from 150 feet away. Two of the bullets were found 9 and 14 feet high. And the defendant had testified he was shooting over the crowd towards an abandoned YMCA building to break up the fight. All his friends were in that melee in the center. Why would he shoot at the people there? There's no way he knew that the police officer who had stopped his car as well to break up the fight, who was wearing blue jeans and a leather jacket, who he could see at 2 a.m. 150 feet away. Now, the state made this whole big thing about he was intending to shoot the police officer. But at the end of the case, the assistant U.S. state's attorney said, We'll never know if Rodney Karaskiel knew that Officer, I forget his name right now. Rothfuss. Rothfuss, right. The audience, please don't help us. Yeah. Otherwise, you'll have to leave. Don't do that. He said we'll never know if he intended to shoot Officer Rothfuss. He didn't intend to injure anyone. He was shooting in a reckless way, in an impulsive way. And therefore, he should have, in fact, been convicted of manslaughter. Plus, let's look at the sentence. The sentence is unbelievable to me. 200 to 600 years. A very rare sentence. And, in fact, we looked at, and it's in the record, all the sentences of Judge Wilson around the time of this case. And there's only one sentence out of, like, 50. Right. Which is 200 to 600 years. So I think there is actual prejudice, but I think the standard should be, and if you look at the law, if you have a judge that is corrupt and is trying to protect, this is not a case where he got money. This is a case where the judge is trying to protect his reputation, his job, and to cover up his prior corruption. And so he had a personal interest in the outcome of this case. And that's why it's a probability of bias. And, of course, you can review this de novo. So you can look at the record and decide whether or not there was bias and to what extent there was bias. The other thing, the other claim that we raised is this proportionate penalties clause of the Illinois Constitution, Article I, Section 12, Section 11. Before you move on to that. Okay. Given all this, you said this is happening during the trial, prior to trial, right? Yeah. So was there ever a request for a substitution of judge? Well, no, because the lawyer who was trying this case didn't have any idea about the Aldman case. He said he never heard of it. He didn't know about it. I thought you were just saying that there was all this public outcry. Yes, there was. There was. So the judge knew about it, public outcry, but the lawyer didn't? No, the lawyer didn't. You know, I'm telling you what he testified to. And what happened later on, and it's in our brief, the lawyer was in federal court and doing a different case, and an FBI agent came up to him and said, oh, you're the, you represented Kerris Skeel. He was the Jesus Christ for Aldman. In other words, he took the sins for Aldman. And he said that, then he realized that the Aldman case. So there was all this publicity and negative statements by the state's attorney and the news media, but he didn't know about it. That's why he took a bench trial. Why would you take a bench trial in a murder case of a police officer when you know all this pressure was on the judge? So he did it, and this is the result of it. And that's what happened in that particular case, that he, there was bias, probability of bias, as well as, what it is is a classic case of compensatory bias, where a judge is biased for other reasons than whatever his state of mind is. This is a bias because he wants to preserve his job and rehabilitate his reputation and make sure that no one is looking into this Aldman case as a criminal matter against him. So that is basically the claim under 1401. The other claim is the proportionate penalties clause, which is, at the time, which is Article I, Section 11 of the Illinois Constitution. And this also can be reviewed de novo. The other claim is the proportionate penalties clause, which is Article I, Section 11 of the Illinois Constitution. And this also can be reviewed de novo. Judge Wilson did not consider Mr. Carrasquillo's age, the fact that he had no prior convictions, or his very difficult childhood, where he was, his mother died when he was 72, I mean 1972, when he was 14, and he lived with his brother alone. He had to take care of his younger brother. None of that, or his own mental state, was not considered by the judge at all. He gave him 200 to 600 years by saying, I've read the precepts report. And this court has said that just reading the precepts report and making some kind of reference to his age, which Judge Wilson didn't even do that, is not enough. And that's Peacock, which this panel actually found that that was insufficient. So he gives him 200 to 600 years without ever deciding whether he could be rehabilitated or returned to citizenship. And that's just a clear violation of the Illinois Constitution. And we were denied the right to file a successor post-conviction petition as a result on that claim. And what we wanted to do was to make a record. We have an as-applied claim under the Illinois Constitution. And what we wanted to do was to show why he could be rehabilitated, why he could be restored to citizenship. This is a guy who's been in prison and has been an exemplary prisoner. He has no disciplinary charges for 20 years. He has a parole plan that is excellent with his family support, his community support. He's been a religious leader in the prison. He was a gang member when he first got arrested. He's left the gangs in 1993. So that's only 25 years he's been away from the gangs. And he's been a mentor to these other people coming into the prison. So get away from the gangs, get an education. Is this in the record? All of this is in the record. Because the record is voluminous. Yeah, yeah, yeah. I have not, I assure you I will read it. But I don't, I just don't want you to say anything that's not in the record. Right, right. All this is in our briefs and in the record. But we weren't able to make a record in front of the judge because he wouldn't let us file our PC petition. And basically he said, oh, you're going to lose it, and therefore I don't see that. He found a cause for not under the successor petition rules, but he said there was no prejudice. And basically he decided the issue by saying, oh, well, there's other cases, yes, they do say you're supposed to have a hearing as an applied, but even then it wouldn't be successful. But he prejudged it. He doesn't know the record we were going to make. We had voluminous information that we could provide to the judge to show that he could be a useful citizen. Was there any offer? No, because he just denied us filing the record, filing the petition. It was a successor petition, and he decided we couldn't file it. Was any of this provided at the sentencing hearing? At the original sentencing hearing? Barely, barely. But certainly the judge was told he has no prior record. Well, that's in the PSI. Yeah. But the PSI, if you look at the PSI, which is in the record, and I think it's in our appendix to our brief. I looked at it. Yeah. I was a, I don't even want to say, I was a judge at 26 and counting. Yeah, I know. For 18 years. Yeah. And it was the sparsest PSI I've ever seen. And it wasn't negative, right? It said he was working, that he graduated high school, that he was interested in sports. I don't remember it saying he graduated from high school. But he did, okay. It did say he had two jobs. Yeah, yeah. So the judge says, well, I read the PSI. And then turns around and gives him 200 to 600 years when he has no prior criminal convictions. And he's 18 years old. That seemed to me to be a violation of the Constitution. And we can show that at a hearing. So what, obviously what we need to do is get the case remanded, assuming you don't reverse on the 1401 issue. Get the case remanded. And let us put on our evidence so we can have a hearing to show that he could be restored to citizenship. And the judge just didn't follow the Constitution. He ignored it. He just wanted to show the people in the courtroom, the police officers, that I'm going to give a sentence that's going to give a signal to everybody that I'm a law and order judge. And I wasn't corrupt. And I'm not corrupt. And, you know, he's also dealing with a murder charge. Who's prosecuting the murder? State's attorney. State's attorney who had criticized him around the Alamo case. So he doesn't want he wants to get the state's attorney on his side. And therefore, he. If he's under investigation, as you say. All right. And there's no J.I.B. investigation or there ever was a J.I.B. investigation. He didn't run for re-election. Why would he care about his reputation? I don't know when he decided not to run for re-election. He may have decided. Well, he didn't, right? He didn't run for re-election. That I don't know. And I don't know if that's in the record. But maybe you know. What the record says is that he ran in 1974. This trial occurred, both these trials, occurred in 77. He would have been up for retention in 80. He would have. The same year that he didn't run. Right. But I'm not sure what the record says. You're saying he didn't try to proceed with retention? Right. That's what the record shows. But I don't think that's very probative, you know. No, but my question is, you know, you're saying that he's worried about his reputation. Right. If he doesn't run for re-election and there's no JIB investigation, why is he concerned about his reputation? Well, the FBI is always looking into corruption. Yeah. He's definitely, in other words, his state of mind about my life is destroyed, I can't be a judge, I'm going to lose my pension. It's pension too. And he said that several months before he comes into this other second high profile case. He wants to make sure that this corruption is covered up, basically. I remembered my question that I had thought about when I was reading this. You referred to the possibility of his parole as illusory. How does that tie into? Well, I don't think it's actually relevant. But the judge in denying us our successive petition said that his sentence was, he was eligible for parole in 20 years. So his 200 to 600-year sentence was only 20 years and then he goes to the parole board. The problem is that he's been to the parole board and because he's got a murder of a police officer, he doesn't get parole. Every year they say it would deprivate the seriousness of the offense to let him out. And then we have the affidavit from the former chairman of the parole board who said, I don't think he'd ever, despite his great record and his support in the community and his family, I don't think he'll ever get parole because there are people on the parole board who will never grant parole to a police officer. But that's with regards to the parole review board. It has nothing to do with the post-conviction petition. No, it doesn't. I mean, it shouldn't because the post-conviction petition is based on the Constitution, Article I, Section 11. And it says that the sentence you gave was in violation because you didn't consider his ability to be rehabilitated and restored to citizenship. But what they're saying is, oh, but he could get parole so that sentence that he got, which is basically a de facto life sentence, he's already done 44 years, 44 years for an 18-year-old kid who had no prior background. What could it be that requires him to continue to be in prison? What is it about him that they don't want to give him parole? And that's because there's a police officer involved. We have police officers here now because of China influence. We had a courtroom when he was on trial full of uniformed police officers every day of the trial. And Judge Wilson is looking at that and he's looking at how he's remembering that he's vulnerable, and that's part of the evidence in this case. Okay. I have a number. I have. You've answered my question. Okay. Well, maybe I'll have some more. Thank you. And, counsel, when you step up again, tell me your name, please. Good morning again. Good morning. My name is Harina Megani-Wakely, assistant state's attorney representing the people. The 214-01 petition in this case was properly denied by the lower court. It was untimely, there was no due diligence in bringing it, and defendant was unable to meet his burden of showing that the judgment was void under extrinsic fraud and compensatory bias. It's important to note that there was an evidentiary hearing held in this case by Judge Maldonado where the defense was able to present any and whatever evidence they felt necessary to show their burden of showing a nexus and actual bias regarding Judge Wilson's corruption from the Al-Aman case. And in this case, as Judge Maldonado correctly found, defendant was unable to meet their burden. The due deference standard is entitled, it should be given to the factual findings that were made by Judge Maldonado, and de novo review should only be to the ultimate legal findings made in this case by the judge. There's, Justice Lampkin, you discussed or wanted to know about what standard to use regarding the bias, whether it should be probability of bias or an actual showing, and the people's position supported by the cases of Bracey, Fair, and Gaucho, an opinion issued by this Court, shows that actual bias is the proper standard in this case. And I would direct this Court's attention to the seminal case on what establishes probability of bias standard, and that's the Hawkins case. And in Hawkins, the Court said, was there a showing of pecuniary interest of the judge in the outcome of the case, and they found, yes, there was. Because Maloney, in that case, took the bribe and then returned it when he realized that the investigation, Graylord investigation was encompassing and being viewed throughout his entire trial on that case, and he voiced concerns that, oh, boy, if I continue, I'm already under investigation. And so the Court found in that case that that showed that there was a pecuniary interest, that Maloney was afraid to lose his job, his reputation, whatever comes from his fears. And that's why — So here there isn't so much an issue that there was an alleged bribe or any type of monetary exchange, but the whole issue seems to be based on the reputation of the judge, the concern about the reputation of the judge, aside from any alleged bribe or exchange of favors. Right. And Judge Maldonado looked at the pecuniary standard, what standard should apply. And as he went through the factual allegations and the proof that was presented, showed that there was no showing of that kind of interest in this case. Putting aside the fact that there was no bribe, he also noted that the whole basis for the interest was that there was this investigation going on, this possibility I'm going to lose my job. But as Justice Maldonado pointed out, there was no Graylord investigation going on at that time. That happened several years later. And the FBI only started investigating the Alamond case in 1989, which is, what, 12 years after this particular point in time that we're focusing on. There was also no evidence that his judgeship was in jeopardy. Yes, there was a public outcry right after the trial of Alamond. Well, there was something. Don't. Wait, wait. There was something in the record. That's the — what's the testimony? Is it Cooley? Who says — he says, my life is destroyed and my career is destroyed and my job is in jeopardy. Well, that's really interesting. I agree. Cooley did say that and he testified to that and subsequently before Justice Duman. But let's put it in perspective and in its particular context. It was said while the Alamond trial was going on. And, in fact, the conversation that took place between Judge Wilson and Cooley occurred where Wilson called Cooley and said to him, you told me this was a weak case. You told me there was no evidence. I'm in trouble. This is terrible. This is terrible. My job is on the line. My reputation is on the line. But let's not forget the fact that even with all of that trepidation, that fear of what was going on, Justice Wilson continued to take the bribe in that case. Obviously, the fear wasn't that great. And he continued to do exactly what the evidence — I don't think that's a good argument, Counsel. I'm sorry? I said I don't think that's a good argument that he's a crook. That's why he took the money. No, but — It was the outcry after he took the money that is relevant. It's not that he's a greedy guy. No, but it shows that if the premise that the defense is trying to establish here is that Wilson voiced these concerns, you know, the validity of those concerns — He voiced concerns that were later realized because there was an outcry. And they were later realized. But by the time that this trial started and timing between the corrupt case and this case is not enough to show a nexus. That's your argument, that the seven-month passing is not enough to make the nexus. Well, there's a suspicion, but it's not sufficient to make the nexus. And so there was also no publicity of — based on the publications that was presented at this evidentiary hearing. There was no publicity of the Alamon trial. It had died down by June 1977. And this trial started in December of 1977. There was, you know, no voiced concerns by Judge Wilson regarding his reputation pertaining to this particular case. And it was based on that and under, you know, the brasty, fair, gaucho readings of the case holdings that Judge Maldonado properly found that there was no showing of a nexus in this case. By the same token, these things, the no bribe in this case, the — none of the facts that the Hawkins case found relevant to show that the lower standard of probability of bias should be applicable, was not proven by this defendant at the evidentiary hearing. And Judge Maldonado used the correct standard and the standard that the people are advocating that this Court use when reviewing the entire case, which is a showing of actual bias that defendant had to have. So in the Alamon case, there is some testimony with regards to the judge saying that, you know, my reputation is wrong, all right? That pertains to the Alamon case. Well, what about this case? Is there any evidence to indicate the judge's mental state with regards to this case? No, there's absolutely nothing. There was nothing voiced by Wilson.  I mean, Seiden testified that Wilson was a hard judge, but yet, as he said, he was an equal opportunity jerk, and I quote. I mean, yes, Seiden testified regarding being unhappy with some of the rulings that were made at the trial. And as an advocate, he was, why, why? That was wrong. But the bottom line is, and when you look at this record and what's happened after the finding of guilt and the sentencing, not one evidentiary ruling by Judge Wilson has been challenged on direct appeal or in any post-conviction proceeding. The presence of police officers, another thing that did occur. That was Seiden testified. There were police officers. Well, this was a murder of a police officer. And as Seiden also testified, it was not unusual for victims and their families to have support systems, aside from a murder of a police officer. And so it's not unusual. And so there was nothing wrong with that. And, in fact, it was brought up to the attention of Judge Wilson regarding this. And Judge Wilson said, this is a public trial. This is a situation where there is a police officer that's been murdered. And do you have anything? Is there anything else going on here? And Seiden said he had no evidence of any threats being made by the police officers in that case. Or, and Wilson said, I'm not taking that into consideration. And, in fact, Seiden said that's one of the reasons why he chose to have a bench trial. Not only because it was a legal defense that he was going to present, but because he knew that Judge Wilson was able to partition things that were going on in the courtroom better than a jury. And, most importantly, with respect to the presence of the police officers, there has to be a connection that the presence of the police officers led to the guilty verdict. And that connection cannot be made by this defendant in this case when one just looks at the overwhelming nature of the evidence, which was affirmed on direct appeal. And so, and plus, you know, for ‑‑ I just, I have to stop you. I hate it when people restate, I mean overstate something. There's no overwhelming evidence. There's one witness who said he shot Levely when he shot. That's it. Who was impeached. And then you have the defendant's testimony to the opposite. The appellate court already ruled that the evidence was sufficient to prove him guilty beyond a reasonable doubt. No judge would say it was overwhelming. So don't say something that the court hasn't said. Go on. Well, with respect to that, and again, with all due respect, I would point out that there was more than just one witness. I said there was more than one eyewitness? There was, well, there was an eyewitness who saw a defendant shooting, but there was also evidence of defendant's statements admitting to shooting the police officer, as well as his actions, not only of flight. You can go on. As I said, I haven't read the whole record. I've read the briefs. What you're saying is not in the briefs. That's why I stopped you. I just don't like anyone to overstate. My position is we state what the evidence is and it falls where it falls, but don't overstate it. It just annoys me. All right. You can go on. So there was nothing shown at trial that showed any actual bias. And also there was, again, nothing in the guilty finding, which was affirmed on direct appeal. There was also nothing in the sentence that was imposed in this case where, as counsel Seiden testified, you know, the 1 to 3 ratio was very common in the indeterminate sentencing scheme that existed at that time. And while it might seem unusual, a 200 to 600, at that time, you know, the 1 to 3 was not unusual. Moreover, there was also testimony that this was not I am going to slam this defendant and I'm going to give him 200 to 600 years. There was also evidence by the investigator who did research into sentences, the 40 sentences that were presented, that another one had also had a situation where Wilson imposed 200 to 600 years. And this happened even before there were any claims that Judge Wilson was corrupt. What about the issue based on the evidence that maybe this should have been manslaughter? That was determined on direct appeal and argued not only before the trial court, but also in on direct appeal. And the court rejected that premise. And, you know, this draconian sentence, as it's labeled, was the practical effect of this draconian sentence was that he was eligible for parole after at most 20 years under the sentencing scheme that existed at that time. And so, again, the people submit that 214.01 petition was properly denied in this case, that due deference should be given to the factual findings made, that the standard of review includes a showing of actual bias and nexus, which defendant has not done in this case. For those reasons, that ruling in particular should be affirmed. Turning to the sentencing issue, believed to file the successive PC was properly denied in this case. It was defendant's burden to show prejudice because cause, as Justice Maldonado determined, was found because of the Miller line of cases coming at the times that they did. And defendant cannot show prejudice. His sentence did not violate the Eighth Amendment or the Proportionate Penalties Clause of Illinois. I mean, with respect to the Miller protections, defendant was an adult over the age of 18. Defendant also was eligible for parole. Under Miller, is there any eligibility on the line? No. Miller didn't necessarily say it was a clear-cut line. Subsequent to Miller, Harris has made it very clear that the age of 18 marks the line between juveniles and adults, and our defendant was 18 and a half at the time that we're looking at. And so Harris has made it clear that there's no – that there's – he was an adult. Defendant also here was eligible for parole with his de facto life sentence. He was eligible after – You know what you're just saying. You just said he was eligible for parole with his de facto life sentence. You're arguing it's not a de facto life sentence. I'm sorry. Excuse me. Okey-dokey. I apologize. I'm sorry, Your Honor. So defendant was eligible for parole. I mean, counsel would love for you to make that statement. I apologize. Okay. Defendant was eligible for parole. He was eligible under that statutory sentencing scheme of as early as 10 years. And, in fact, defendant has had the opportunity for numerous, over 30, parole hearings, at which time he is allowed, per the guides of the parole, to present evidence of rehabilitation that can be considered by the parole board. And that satisfies – He has been rehabilitated and the parole authority always just says the same thing, the seriousness. It would deprecate the seriousness of his offense. My thought is, can he ever truly be eligible for parole if that can always be the standard? Given Montes' affidavit, that's what was disturbing to me, Mr. Montes' affidavit. Well, Mr. Montes' affidavit, he left the board in 2010. So he was – He was there 16 years before that. Right. But with respect to, if we're looking at the defendant's time tenure, he left the board in 2010. And since then, there's been many hearings held after that. There's been new members on the panel. And if the procedure itself, the manner in which parole is granted or denied, is improper, this is not the forum. The issue before this Court is whether the fact that he had a meaningful – I want to just stop. What is the forum? Is there an appeal from the parole board? I don't know. That's why I have to read the record. You say this is not the forum. Is there another forum? Yes. And, Your Honor, I – What is the other forum? There's – there's a process, and I cite a case – and I'm sorry, I don't have it in front of me – in my brief that says that if there is a discrepancy made by defendant regarding his opportunity before the parole board, that there is a remedy that's available to him, but that it's not necessarily this particular forum where we're addressing the constitutionality of whether his sentence was constitutional under the parameters of the Eighth Amendment or the proportionate penalty. And I'm sorry, I can look it up. It is cited in my – and I believe – What about the issue that the trial court never looked at the rehabilitative factors with regards to sentencing the defendant? He – the trial court held a sentencing hearing and reviewed the evidence that was presented. The parties were allowed to argue mitigation as well as aggravation. And the PSI was presented to the court. And, you know, the defendant argues that this PSI was – you know, showed that it was a reckless juvenile action that was occurred, no background. And, yes, that was shown. But to challenge his sentence under the constitutional guidelines that he has framed his argument, he has to show much more than that. Harrison Thompson have made it clear that mere age and family background that has been presented is not the end all. He has to show in this particular case under a proportionate penalty challenge that he's alleging that his brain, his maturity was – the cognitive functioning that he had was equivalent to a juvenile of the protections recognized by the Miller juvenile at the time of the crime. And he doesn't present any evidence of that. In fact, just even the PSI shows that he had a 12th grade education. He did not graduate from 12th grade because he was arrested while he was in high school at that time. He held jobs. In fact, his evaluations at these jobs showed that he was a more than able, capable, and recommended employee. He had hopes and dreams. He hoped to become a mechanic. And his own actions in what he did in this case showed that this wasn't just an impetuous. He did shoot someone. He bragged about it. And then he hid the murder weapon. And so, you know, nothing about defendant's sense in this case violates any of the constitutional mandates that fall under Miller and subsequently under Harrison-Thompson for the proportionate penalties clause. With respect to defendant's reference to the Peacock case, yes, I believe this panel might have written it. Of course, the people's position on that is that it was wrongly decided. But with that said, there's a big difference between the Department of Corrections credit for good time that was being addressed in that case and the parole hearing that's issued here, where this parole is totally different. A hearing is held. It is open to the public. Defendants are allowed to present evidence of rehabilitation. And this decision is not made by one person at Department of Corrections, but made by a panel of possibly 14 members, I believe, currently, that have to, you know, that reach a consensus by majority rule. And so in that respect, if there is going to be any comparison made to Peacock, the facts are just totally different. And the scenario and the opportunity for release that defendant had in this case is entirely different. For those reasons, as well as the ones stated in our briefs, we would respectfully ask that the rulings made below with respect to the 214-01, as well as the denial of the leave to file successive petition, be approved. Thank you. First of all, the Parole Board does not have to consider rehabilitation or a new parole plan. It can deny you parole, which it has for Mr. Carrasquillo, based on the seriousness of the offense, which is immutable. It never changes. And I cite to you Hanrahan v. Williams, which says, Prisoners cannot compel the Board to exercise its discretion in a certain manner. So there's no suit that you could bring saying, oh, they're denying parole because they don't consider rehabilitation or consider your parole plan. If they say that we deny you parole because it would deprecate the seriousness of your offense, you cannot appeal that. It's a discretionary. So there's no issue with the Parole Board somehow rehabilitating this 200-to-600-year sentence. I find it odd to say, well, it's got to be a 1-to-3 spread on a sentence and say, well, that's good. 200-to-600 is 1-to-3, so that makes it appropriate. And I think that's a good argument.     I think that's a good argument. I think that's a good argument. He could have given them 50-to-150 or 25-to-75. Why did he pick 200-to-600? He didn't justify it. Your argument is that he was sending a message. Right. Right. Counsel said that the 1401 claim is untimely, but we brought a case of a void claim, extrinsic fraud, and there's no time limit on that. So the timely argument is not appropriate. I want to just quote to you from Hawkins, which counsel mentioned. It says here, Maloney, talking about Maloney, Maloney possessed and actively cultivated a personal pecuniary interest in the outcome of defendant's case. That Maloney subsequently returned the money did not render his interest in the outcome any less acute. As defendant suggests, he wanted to ensure that he did not lose his judicial post and salary and, therefore, was motivated to return a verdict that would not spark the suspicions of authorities. And they found that that was a probability of bias because of a personal interest. This is the same thing with Judge Wilson. He did not want to lose his judicial post and salary and, therefore, was motivated to return a verdict. We're not challenging the evidentiary rulings by Judge Wilson. It was a bench trial. He knew what he was going to do. It doesn't matter what the evidentiary rulings are. He was going to convict this young man and give him 200 to 600 years. And there's no ñ nothing that supports the idea that there shouldn't have been a hearing about his background, his family. Judge Wilson didn't consider that. All he said was I read the pre-sentence report. That's not enough. He said that in Peacock. It's not enough to say I read the pre-sentence report. And if you look at the pre-sentence report, there's nothing in there that would justify the sentence that he gave him. I think this is a proper case to remand for let us make a hearing, let us show his mental state, let us show his family problems, his mitigation, and then decide whether or not his sentence of 200 to 600 years was appropriate. Wasn't all of that permitted before Judge Maldonado? No. No, it was not. We filed a successive petition. We asked for it to be filed. We would have shown all this in a hearing, and he denied us the right to file a successive petition. It was never put ñ his background, his family, his personal problems ñ were never put in the record in front of Judge Maldonado. Judge Maldonado decided that it was prejudice. He rejected the fact because they said somehow that it didn't apply to Mr. Caraschio because he was not a lookout for the crime. In other words, his alleged involvement in the crime was more serious, and therefore it doesn't matter and he was never going to get a change of sentence. So one thing I will say, every witness in this case ñ and you're correct, Judge, there was only one witness, eyewitness, and that witness was ñ If you all's briefs are accurate, it's correct. Yeah. Yes, I have not read them. But you were right. There was only that one eyewitness who was arrested, kept in custody for 12 hours, tortured, accused of ñ it was his gun that was used in the shooting. And Mr. Caraschio said, yeah, I shot, but I was intending to shoot over the crowd. I wasn't intending to injure anybody. And, you know, it could be a fair judge could have found that was a manslaughter. So just to sum up, I think there is a serious nexus here. It's not made up. It's unique. You don't find cases where the judge has stated how much concerned he was about his job and his future, and then you have all this publicity against him, and here comes this young Puerto Rican 18-year-old kid, and he's going to make his reputation and rehabilitate himself in this case. And that's what happened. And certainly this Court should remand it for a hearing on his claim under the Illinois Constitution because he never got the right to make a show of hearing. There was no real hearing in front of Judge Wilson, and you can tell by the fact that he doesn't justify in any way the 200 and 600 years. I mean, if you have somebody that's 18 years old and has no criminal convictions, how do you give a kid 200 or 600 years? He didn't consider anything but to give him the sentence and get it over with. And all the witnesses in this case, some who testified and some who didn't, were arrested and tortured. And there is a claim in front of the Torture Commission about this. And Rodney Periskeo himself was hung by poles in the police station. So Judge Wilson didn't really turn his back on that, didn't really consider it. He didn't care that the courtroom was full. He wanted to please the state's attorney and rehabilitate himself, and I respectfully ask in the name of justice, because that's what 1401 says, if you read Lawton. This is a statute to achieve justice. In the name of justice, don't keep this man in prison after 44 years. Even if you think, well, he killed a police officer and that's terrible, it is. He did kill him. Yeah, he did. He did. There's no question about that. But did he intentionally kill him? Was it a recalcitrant? Was it an act of an 18-year-old? These are things that should have been raised at the trial. So I hope you'll consider all these issues and thank you for your time. Thank you. Thank you both. Let me just say, because the record can't reflect it unless I say it, we have a courtroom full of people. I recognize some of them as police officers, as officers who are, I see the FOP here. I see people in uniform. I also assume some of the people who are here are from Mr. Carrasquillo's family. Our questions are asked to probe. They do not, and are not intended to signal what kind of ruling we're going to make. We're going to make the ruling that we believe is based upon the evidence and the law in this case, and that's all. I do want to say this. I said I wasn't going to, but I was married to a policeman. My sister is a policeman. I don't think it's wise. I just don't think it's wise for police to stand behind the parole authority when they make their decision. I think it's something that ought to be discussed. I don't know if it ever happened before, but that's what we have a photograph of in our record, nine policemen in uniform standing behind two parole authority members, and that was disturbing to me because I know the emotion that you have, but we don't want to send the wrong message to the public who is seeing something. We will take this under consideration, and those are my thoughts. Those are not Justice Reyes' thoughts. I want us to do everything decently and in order. Thank you so much. We will consider this case.